LISA HOLDER (SBN 212628)
LAW OFFICE OF LISA HOLDER
lisaholder@yahoo.com
P.O. Box 65694
Los Angeles, California 90065
Telephone:    (323) 683-6610

SHIRIN BUCKMAN, ESQ.    (SBN 314634)
LAW OFFICE OF SHIRIN BUCKMAN
ShirinBuckmanLaw@gmail.com
PO Box 1053
Los Angeles, CA 90028
Telephone:    (323) 645-7430
Cell:           (323) 463-3326

ALANA YAKOVLEV, ESQ. (SBN 270910)
WALK FREE LAW
walkfreelaw@gmail.com
611 S. Catalina Street, Suite 222
Los Angeles, CA 90005
Telephone:    (213) 674-7323
Facsimile:    (323) 998-6339
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHLEEN WILLIAMS, an individual; and MICHAEL HILL, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LONG BEACH, a municipal entity; Officer ROBERT J. CRUZ; Officer NORMAN A. DUMAPLIN; Sergeant JONATHAN STEINHAUSER; LOS ANGELES COUNTY METROPOLITAN TRANSIT AUTHORITY, a municipal entity; and DOES 1-10,<br><br>Defendants. | Case Number: 2:18-cv-01069<br><br>HON. ANDRE BIROTTE, JR.<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT LOS ANGELES COUNTY METROPOLITAN TRANSIT AUTHORITY'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**<br><br>Date: September 28, 2018<br>Time: 10:00 a.m.<br>Ctrm: 7B<br>Complaint: February 7, 2018<br>Trial Date: TBD |

**INTRODUCTION**

This Court should deny Defendant Los Angeles County Metropolitan Transit Authority (MTA)'s motion to dismiss Plaintiffs Kathleen Williams and Michael Hill's Third Amended Complaint. The motion should de denied and plaintiffs should be permitted to proceed to discovery.

This case involves discriminatory policing, arrest, and detention by officers of the Long Beach Police Department enforcing the MTA Code of Conduct on the MTA Blue Line. Plaintiffs Williams and Hill were both detained and cited because they purportedly did not have sufficient fare on their cards, even though they actually did, and Ms. Williams was arrested, handcuffed, and actually spent 48 hours *in jail* in deplorable conditions, even after she produced her TAP card for the officers to determine that fare was, in fact, loaded on her TAP card. Ms. Williams suffered an anxiety attack, vomited numerous occasions, fainted multiple times, and was severely traumatized by her experience; Mr. Hill was also injured by the conduct.

While much of the conduct involves the Long Beach Police Department, which has not moved to dismiss, Plaintiffs' lawsuit also names as a defendant the prime mover of the policies and practices that occurred here – the MTA. The MTA contracts with other law enforcement entities to enforce its codes and rules and the Long Beach Police Department is one of those entities. Crucially, as alleged in Plaintiffs' complaint, MTA has policy making authority over the enforcement of fare evasion on its trains and also has the authority and duty to train those who are policing its train system.

Defendant MTA's Motion to Dismiss the Third Amended Complaint is frivolous and sanctionable under Rule 11. MTA has deployed the same untenable legal and factual arguments that it deployed in the Motion to Dismiss the Second Amended Complaint. Those identical arguments were rejected by this Court in its ruling on the Motion to Dismiss the Second Amended Complaint. MTA's motion does not even pretend to address the two new causes of action that serve as the basis for the Third Amended Complaint. Rather, it

1   exclusively reiterates and regurgitates arguments to the previously plead causes of action that

2   this Court has already upheld.  Further, Defendant stubbornly proceeded to file this motion,

3   despite Plaintiffs attempts to dissuade Defendant from pursuing these repetitive arguments

4   that blatantly disrespect this Courts' authority.  Defendant's conduct is willful and

5   contumacious.  Thus, MTA's motion to dismiss constitutes a frivolous, burdensome, a time-

6   and resource- consuming exercise for plaintiffs, and an offensive waste of judicial resources.

7   That is the crux of Plaintiffs' argument for Rule 11 sanctions.

8        Moreover, Defendants' re-packaged, rejected arguments are barred under the law of

9   the case doctrine, especially as there has been no new intervening case law to reconsideration

10  of these arguments.  This Court should utilize this doctrine to summarily deny Defendant's

11  request for dismissal of the federal claims.

12       Defendant presents only one alternative viable argument in its lengthy, redundant

13  brief. That is the argument that Plaintiffs' state claims should be dismissed for failure to

14  exhaust administrative remedies under Civil Code section 945.5.  Plaintiffs concede that point

15  and do not oppose the dismissal of the state claims on those grounds, but only to the extent

16  that the claims seek monetary damages.  The caselaw clearly establishes that state claims can

17  proceed to the extend they seek equitable relief.  Therefore, the Unruh and Ralph Act claims

18  should proceed as to declaratory and injunctive relief.

19       In this opposition, Plaintiff presents substantive responses only to Defendants' new

20  arguments that were not previously raised and rejected by this Court. As to all of the

21  previously raised and rejected arguments and to the alternative arguments that could have

22  been raised in the previous motion to dismiss, Plaintiffs defer to The Opposition to the Motion

23  to Dismiss the Second Amended Complaint, filed with this court on August 16, 2018.

24  ///

25  ///

26  ///

28  ///

---

**PLAINTIFFS' OPPOSITION TO LA MTA'S MOTION TO DISMISS**
**THIRD AMENDED COMPLAINT**

**STATEMENT OF FACTS**

1.    **Plaintiffs Are Discriminatorily Stopped, Cited, Arrested for Purportedly Not Having Train Fare While Riding the MTA**

Plaintiffs Ms. Williams and Mr. Hill are African-American. On February 14, 2017, they exited the Metro Blue Line of the Los Angeles County Metropolitan Transit Authority at the Willow Station.  (Second Amended Complaint, Dkt. #27 [hereafter SAC] at ¶12). As Ms. Williams and Mr. Hill exited the Willow Station platform to the Willow St. exit, they observed Long Beach Police Department Officers Robert J. Cruz ("Officer Cruz") and Norman Dumaplin ("Officer Dumaplin") stop two African-American women to ask for their Los Angeles County Metropolitan Transit Authority ("MTA") issued TAP cards and threaten one of the women that if she did not sign her civil citation for fare evasion (which would have been a violation of the Metro Customer Code of Conduct), she would be arrested.  (SAC ¶13).

Officers Cruz and Dumaplin also asked Ms. Williams and Mr. Hill for their MTA-issued TAP cards, while non-African American riders were permitted to walk by the officers. (SAC  ¶13).  Ms. Williams began to search for her MTA-issued TAP card, which she could not locate at the time.  (SAC ¶17).  Mr. Hill produced his MTA-issued TAP card, which Officer Dumaplin ran through his MTA-issued hand-held reader that erroneously showed that Mr. Hill had no fare loaded onto his MTA-issued TAP card.  (SAC ¶15).  Mr. Hill confirmed for the officers that he had adequate fare loaded and had tapped his card on an MTA-operated machine upon boarding the train at Pacific Station, and he requested that Officers Cruz and Dumaplin summon their Sergeant.  (SAC ¶¶16, 20).

When Sergeant Jonathan Steinhauser ("Sergeant Steinhauser") arrived at the scene, Mr. Hill accompanied him to the Metro fare machines on the Willow Station platform so that Mr. Hill could demonstrate to Sergeant Steinhauser that he had indeed tapped his card and that there was fare loaded on his card.  (SAC ¶20).  Although the machine revealed that Mr. Hill had fare loaded on his MTA-issued TAP card and that the hand-held reader was in error,

Sergeant Steinhauser threatened Mr. Hill that if he did not sign the ticket, he would be arrested. (SAC ¶20).

Mr. Hill was cited for a violation of Rule 6-05-230A of the MTA Customer Code of Conduct, a rule that was developed and is promulgated and enforced by the MTA through the Long Beach Police Department ("LBPD"). (SAC, Exhibit A, 10:15-19). (SAC ¶20). The ticket that was dispensed to Mr. Hill by Officer Dumaplin is a "Notice of Transit Violation" with the MTA logo on the top left corner. (SAC ¶20). Mr. Hill signed his ticket. (SAC ¶¶16, 18)

Ms. Williams was cooperative, but she reiterated that she had tapped her card and refused to sign the ticket. (SAC ¶¶16, 18). (Accordingly, Ms. Williams was arrested on MTA property for refusal to sign a MTA ticket which alleged a violation of the MTA Customer Code of Conduct. (SAC ¶¶18, 22, 24). In fact, fare evasion and the refusal to sign an administrative violation are not considered criminal conduct under California or federal law. (SAC ¶19).

While seated in the back of the police car, Ms. Williams felt a sharp object in her pocket and discovered her TAP card. (SAC ¶25). She indicated to the officers that she found her TAP card, to which Sergeant Steinhauser responded, "Too late, you're going to jail," without attempting to determine whether Ms. Williams had indeed tapped her MTA-issued card or had fare loaded. (SAC ¶25).

Ms. Williams was handcuffed by the officers and taken to the Long Beach City Jail. (SAC ¶26). During her transport to the Jail, she experienced an anxiety attack and vomited. (*Id.*) At the jail, she was thrown against a wall by the police lockers and told to "look the other way." Not knowing what was happening, and fearing for her life because of her awareness of police abuse and violence, she fainted, fell and bruised her face. (SAC, ¶26-27). She was first placed in a freezing cold cell and later moved to an unsanitary cell that had blood and spit smeared across its walls and bed. (SAC, ¶29). The ventilation emitted a noxious, gassy smell, causing her to faint four more times, and to experience terrible headaches while incarcerated.

1    (*Id.*) She ended up spending *forty-eight* hours in the City Jail, and was not even told the

2    charges against her until she was released. (SAC, ¶¶31-32, 35-36). The charges were for

3    giving false identification to a police officer, and playing sound equipment on public

4    transportation, neither of which were true. (SAC, ¶32). In fact, Defendants Cruz and

5    Dumaplin falsified their crime report and lied about Ms. Williams' statements, facts which

6    can be proven by audiotape. (SAC, ¶30).

7            This lawsuit against Long Beach Police Department, some of its personnel, and the

8    LA City MTA was filed on or about February 7, 2018.

9    **2.      MTA Sets the Policies By Which Its Contracted Entities, Including the Long**

10   **Beach Police Department, Carry Out Their Ticketing, Citation, and Arrest**

11   **Practices on the MTA, And Failed to Supervise and Train Its Agents**

12           While Long Beach officers actually stopped, cited, and arrested the Plaintiffs, MTA

13   enjoys a legal relationship with the City of Long Beach to enforce MTA rules and regulations

14   and ensure that passengers abide by sections 6-05-230 and 6-05240 of MTA's Customer Code

15   of Conduct within the City of Long Beach.  (SAC ¶8). Therefore, LBPD is legally tasked with

16   enforcing MTA's rules and regulations as a party to this legal relationship.  (SAC ¶8).

17   Furthermore, MTA engages in a legal relationship with its riders by virtue of the contract that

18   riders enter into with MTA when they purchase an MTA-issued TAP card and load it with

19   fare in consideration of MTA's provision of transportation services.  (SAC ¶8). Upon

20   information and belief, the City of Long Beach has a legal relationship with the MTA to

21   provide law enforcement presence in its public transportation facilities, including, but not

22   limited to, trains, buses, train stations, and bus stations within its jurisdiction.  (SAC ¶4).

23           For years, the MTA has intentionally promulgated the no-turnstile "honor system" on

24   Metro lines, such as the Blue Line and the Gold Line, which run through low-income

25   communities of color, such as the Willowbrook/Rosa Parks, Willow, Compton, and Watts

26   Stations.  (SAC ¶40).  On these Metro lines, riders are permitted to freely enter the platform

28   and board the train, with no structural requirement of tapping their card or otherwise paying

fare because the no-turnstile "honor system" is maintained without a turnstile, barrier, or any type of physical impediment disallowing access to the platform or train to riders that have not tapped their card or otherwise paid their fare.  (SAC ¶40).  MTA considerably steps up law enforcement deployment to stations and rail lines identified with the "honor system."  (SAC ¶¶40-52).  This system actively and intentionally encourages local law enforcement to patrol these stations to disproportionately stop, detain and cite African-American riders for violating MTA's Customer Code of Conduct.  (SAC ¶¶40-52). As a result, African-American riders are arbitrarily and indiscriminately cited for fare evasion, and ancillary violations, at a rate much higher than other riders.   (SAC ¶¶40-52).

MTA not only maintains a system that targets lines with larger percentages of African-American riders with its "honor system," but expends considerable resources to ensure the promulgation of law enforcement's targeting of African-American riders.  (SAC ¶42).  From the time of its inception in the 1980s, the MTA and its predecessors spent over ten times the national average on underground rail security and policing on the Metro Blue Line.  (SAC ¶42). This exorbitant expenditure on policing continues to the present, and in fact, expenditures have increased since 2016.  (SAC ¶42).  In 2017, the budget for security increased from approximately 90 million to 160 million annually and the police patrols doubled from roughly 140 to over 300 per 24 hours.  (SAC ¶42).  This massive increase occurred in 2017 despite the fact that the rate of serious crime on Metro fell by ten percent from 2015 to 2016.[1]  (SAC ¶42).  In fact, African Americans make up less than twenty percent of the ridership on the Metro but receive more than fifty percent of the citations for fare evasion and code of conduct violations.[2]  (SAC ¶44). Whites and Latinos receive citations consistent with their percentage of ridership.  (SAC ¶44).  Similarly, African

---

[1] Laura J. Nelson, "Metro approves a $797-million security plan that reduces the power of the Sheriff's Department," Los Angeles Times, February 23, 2017, http://www.latimes.com/local/lanow/la-me-ln-metro-transit-police-20170223-story.html (SAC page 18, footnote 1).
[2] Jenna Chandler, "Civil rights complaint alleges LA Metro, police target black riders," Curbed Los Angeles, January 18, 2018, https://la.curbed.com/2017/1/18/14316324/metro-discrimination-fare-evasion-citations. (SAC page 19, footnote 2).

Americans on the metro are arrested at a median rate of 55%, while whites and Latinos are arrested at rates consistent with their proportionate ridership. (SAC ¶44).

Upon information and belief, DEFENDANT MTA had notice of claims of racial profiling of its African American passengers before February 14, 2017 not only through copious complaints by communities of color and riders of color, but also through a US Department of Transportation investigation. (SAC ¶¶40-52). In addition, it was public knowledge, and MTA was well aware, that the LBPD had a reputation for targeting African-American individuals with unsavory law enforcement tactics, including a pattern and practice of egregious racial profiling. (SAC ¶¶53-55, 79). Despite MTA's knowledge that LBPD engaged in selective enforcement and unconstitutional policing, MTA actively, intentionally, and consciously chose to enter into a legal relationship with LBPD to enforce its Metro Code of Conduct on Metro property and provided LBPD with tools, equipment, and resources by which to do so without providing guidelines, training, or policies to prevent predictable racialized systemic abuses by LBPD. (SAC ¶¶48, 52, 54, 79).

As relevant to the *Monell* claim under 42 U.S.C. §1983, MTA is duly empowered to supervise and train its policing agents in enforcing MTA rules and regulations and to supervise the rules of police engagement on its train platforms. (SAC, ¶¶50, 52). However, MTA does not provide sufficient guidance, training, or oversight evidencing MTA's deliberate indifference to the obvious dangers its policing regime presents to African American riders. (SAC, ¶78). MTA has directly generated and prescribed the policies to be followed and enforced by the City of Long Beach, yet has failed to properly supervise and train the officers who are carrying out fare and code of conduct enforcement at its behest. (SAC ¶¶77, 78). In addition, as relevant to the state law claims, LBPD officers were agents, servants, and employees of their co-defendants, and in doing the things alleged, were acting within the scope of their authority as agents, servants, and employees and with the permission, consent, ratification, and endorsement of MTA. (SAC ¶10).

---

1

**LEGAL ARGUMENT**

2

**I.      STANDARD FOR MOTION TO DISMISS**

3

Under Rule 12(b)(6), a court must (1) construe the complaint in the light most

4 favorable to the plaintiff, and (2) accept all well-pleaded factual allegations as true, as well as

5 all reasonable inferences to be drawn from them. *See Sprewell v. Golden State Warriors*, 266

6 F.3d 979, 988 (9th Cir.), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001); *Pareto v.*

7 *F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). Dismissal pursuant to Rule 12(b)(6) is proper

8 only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts

9 alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696,

10 699 (9th Cir. 1990); *Johnson v. Riverside Healthcare Sys.*, LP, 534 F.3d 1116, 1121-22 (9th

11 Cir. 2008).

12

Moreover, contrary to Defendant MTA's position, at the pleading stage, plaintiff is not

13 required to identify the specific superficial principal-agent capacity overlaying the basis for

14 agency and control.   That is a question of fact requiring discovery, and is, thus, an

15 inappropriate basis for dismissal at the pleading stage.   *Gurrola v. Jervis*, 2009 U.S. Dist.

16 LEXIS 133234, *24 (C.D. Cal. April 2, 2009) (the capacity in which the employee or agent is

17 acting for a principal generally is a question of fact to be addressed at the summary judgment

18 stage.)

19

**II.      LAW OF THE CASE FRAMEWORK ON A MOTION TO DISMISS**

20

The law of the case doctrine is a judicial invention designed to aid in the efficient

21 operation of court affairs. *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (citing

22 *Herrington v. Cnty. of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993)). "Under the 'law of the case'

23 doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the

24 same court, or a higher court, in the same case." *United States v. Jingles*, 682 F.3d 811, 816-

25 17 (9th Cir. 2012) (quoting *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988));

26 see also *United States v. Park Place Assocs.*, 563 F.3d 907, 925 (9th Cir. 2009) (stating that

28 "when a court decides upon a rule of law, that decision should continue to govern the same

issues in subsequent stages in the same case" (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S. Ct. 1382, 75 L. Ed. 2d 318 (1983))).  For the doctrine to apply on s motion to dismiss, the issue in question must have been "decided explicitly or by necessary implication in the previous disposition."  *Lower Elwha Band of S'Klallams v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000); *Munoz v. PHH Corp.*, No. 1:08-CV-00759-AWI, 2015 U.S. Dist. LEXIS 67226, 2015 WL 2454270, at **8-10 (E.D. Cal. May 22, 2015) (applying law of the case to dismiss second amended complaint where plaintiffs alleged same facts already rejected by prior dismissal order).

   Further, under the law of the case doctrine, a party may neither "revisit theories that it raises but abandons," nor "offer up successively different legal or factual theories that could have been presented in a prior request for review." Sec. *Investor Prot. Corp. v. Vigman*, 74 F.3d 932, 937 (9th Cir. 1996) (quotations and citations omitted).  HN6 Although application of the doctrine is discretionary, id., a court abuses its discretion in applying this doctrine if: "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (citations omitted); see also *Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005) (listing additional factors as including whether other changed circumstances exist, or a manifest injustice would otherwise result). See *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988) (HN15 "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe [sic] to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'").  *SEC v. City of Victorville*, 2017 U.S. Dist. LEXIS 209607 *

   Moreover, the court does not leave the door open to an alternative theory that Defendant could have — but clearly did not — present in its first Motion to Dismiss. The law of the case doctrine exists for this precise reason — to prevent litigants from taking a "second

bite" of the apple. See *Jingles*, 682 F.3d at 819 ("Jingles had his bite at the apple, and we will not give him a second bite unless one of the exceptions to the law of the case doctrine applies."); see also *Cape Flattery Ltd. v. Titan Mar. LLC*, 2012 U.S. Dist. LEXIS 106419 *8-*9 (D. Haw. July 31, 2012)

Furthermore, in certain circumstances, federal courts have imposed sanctions where parties submit motions that are "utterly baseless" because of the law of the case.  See *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 935 F. Supp. 443, 450 (S.D.N.Y. 1996).

## II.   PLAINTIFFS HAVE ADEQUATELY PLEADED CLAIMS UNDER 42 U.S.C. §1981 AND §1983

### A.   The SAC Plausibly Establishes that MTA Policies Engender Disparate Treatment of Black Riders

The SAC amply alleges that MTA devises and promulgates racially biased policies that target African American.  First, the MTA promulgates a policy of over-policing denominated as "felt presence" wherein an over-abundance of police officers are deployed to rail lines and stations that service predominantly black riders. (SAC ¶¶38, 43-44, 48-49, 100). Second, the MTA advances a "broken windows" policing philosophy that foreseeably targets African American riders.  (SAC ¶¶38, 42, 44). Third, the MTA utilizes a no turnstile "honor system" that is highly susceptible to biased policing and racial profiling on lines and platforms with higher black ridership.  In contrast, MTA maintains turnstiles on lines and stations with fewer black riders.  (SAC ¶¶40-41).  Furthermore, the SAC plausibly establishes that MTA is the municipal entity that creates and promulgates these discriminatory policies and is thus directly liable for the injuries to Plaintiffs.  (SAC ¶97). Defendant's contention that the SAC fails to describe the means by which MTA encouraged over-policing and racial profiling of African Americans is belied by the robust allegations to the contrary in the SAC. (Mot. To Dismiss at p. 9).

Notably, even if Plaintiffs failed to establish that MTA had control over LBPD officers, the fact that MTA's discriminatory policies is plead so amply would be sufficient to

overcome that defect at the pleading stage.  *Green v. New York City Hous. Auth.*, 1997 U.S. Dist. LEXIS 4136 (S.D.N.Y. 1997) is instructive on this point.  In *Green,* the plaintiff brought a § 1983 claim against the City of New York alleging that New York City Housing Authority police officers violated plaintiff's constitutional rights. Id. at *3. At the time, the Housing Authority was an independent and separate entity from the City of New York, and the City did not exercise control over the Housing Authority's police officers. *Id.* at *4. In denying the City's 12(b)(6) motion to dismiss, the court determined that plaintiff's argument that "the City's policies themselves led to the violation at issue…[was] enough, at the pleading stage, for the § 1983 claim to survive against the City." *Id.* at *6-*7.

Additionally, the allegations of disparate treatment engendered by MTA policies are fortified with statistics that show a striking disparate impact and entrenched and longstanding racial profiling practices that satisfy the legal benchmarks for robust pleading of disparate treatment and *Monell* elements of custom and widespread practice.  (SAC 44-47) *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009) (Statistical evidence of alleged race neutral policy that accurately captures the effects of disparate impact, in conjunction with other forms of circumstantial evidence, meet the pleading standard to show discriminatory intent); *Henry v. County of Shasta* 132 F.3d 512, 519-521 (encouraging courts to rely on "me too" and historical evidence of similar violations as evidence of *Monell* custom and practice.)  Indeed, the statistics are so stark that even defendant concedes that they establish disparate impact.  (Mot. To Dismiss at p. 13). Despite this recognition, defendant mischaracterizes these statistics and plaintiffs' systemic, contextualized analysis as "past sporadic incidents involving entirely separate facts" and proceeds to cite to a series of inapposite caselaw. (Mot To Dismiss at p. 13).   This mischaracterization is transparently self-serving and contrary to well established law.

///

///

///

---

**B.**   **The SAC Plausibly Establishes that MTA Was on Notice that their Policies Engender Racial Profiling But Was Deliberately Indifferent to the Obvious Danger to African American Riders**

The SAC alleges that MTA was on notice for many years that African American passengers were being over-policed and racially profiled as a result of its "felt presence"—a euphemism for its broken windows and skewed honor system policies. (SAC ¶¶45-49). The SAC further alleges that, despite having ample notice of the danger to African American riders prior to 2017, the MTA dramatically increased the number of officers deployed on rail lines serving African American customers.  This shift in policy adequately alleged in the SAC plausibly establishes that MTA was indifferent to the danger its discriminatory policies presented to African American customers.  *Henry v. County of Shasta*, 132 F.3d 512 (1997) (post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.) *See also Connick v. Thompson*, 563 U.S. 51, 62 (2011) (The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution.")  These allegations of notice also constitute circumstantial evidence of discriminatory intent. *Village of Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor [in the adoption of a facially neutral policy] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.")

**C.**   **The SAC Plausibly Establishes that MTA's Discriminatory Policies Constitute the Moving Force Behind Plaintiffs' Injuries and Render MTA Directly Liable for these Injuries**

The allegations support the inference that Plaintiffs were stopped, harassed and detained because MTA was deliberately indifferent to obvious warnings that African American passengers were being racially profiled as a result of MTA's policing policies.

(SAC ¶¶12-18, 45-49).  Thus, the SAC plausibly establishes that MTA is directly liable for the constitutional violations that injured Plaintiffs based on a theory of deliberate indifference. The pleadings meet all established legal benchmarks for establishing causation and a plausible case for *Monell* liability based on an official policy theory.  *Green v. New York City Hous. Auth.,* 1997 U.S. Dist. LEXIS 4136 (S.D.N.Y. 1997).

> **D.**  **The SAC Does Not Contemplate *Respondeat Superior* as a Basis for *Monell* Liability**

Plaintiffs' counsel is well aware of hornbook caselaw precluding *respondeat superior* as a basis for entity liability.  *Federation of African Am.Contractors v. City of Oakland*, 96 F.3d 1204, 1215 (9th Cir. 1996); *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29 (2010). The SAC does not contemplate *respondeat superior* as a predicate legal theory for *Monell* or section 1981 entity liability.  Notably during the meet and confer process, Plaintiffs' counsel clearly explained to MTA counsel telephonically and via letter that *Monell* and section 1981 are predicated on a theory of direct liability and not on a theory of vicarious liability and cited to caselaw further explicating and supporting plaintiff's legal analysis.  *See* Holder Dec.  ¶¶ 6, Exhibit A, attached hereto.

Specifically, Plaintiffs' counsel cited to the holding in *Green v. New York City Hous. Auth.*, 1997 U.S. Dist. LEXIS 4136 (Plaintiff has made a claim that the City established policies for the Housing Authority police and the Housing police therefore implemented those municipal policies which resulted in the alleged civil rights violations. Plaintiffs do not seek to hold the City liable under § 1983 on a *respondeat superior* claim. Rather, Plaintiffs argue that the City's policies themselves led to the violations at issue and that is enough, at the pleading stage, for the §1983 claim to survive against the City.). Therefore, MTA's conclusion to the contrary is baseless, argumentative, and unworthy of any further substantive response.  (Mot. To Dismiss at p.8-9). The Court should summarily dismiss Defendant's arguments in reference to *respondeat superior*.

///

E.   **Plaintiffs Adequately Plead MTA *Monell* Liability for Failure to Supervise and Train LBPD on Racial Profiling Issues, Despite the Obvious need for Training**

To state a claim for failure to properly train, a plaintiff must allege at the pleading stage "that (1) [s]he was deprived of a constitutional right, (2) the City had a training policy that amounts to deliberate indifference to the [constitutional] rights of the persons with whom [its police officers] are likely to come into contact and (3) [her] constitutional injury would have been avoided had the City properly trained those officers." *Doe v. City of San Diego*, 198 F.Supp.3d 1153 (2016).  Plaintiffs' SAC satisfies these benchmarks.

The SAC establishes that MTA was on notice that LBPD had a long and notorious history of racial profiling of African Americans which predated Plaintiffs' injuries and that there was an obvious need to train and closely supervise LBPD officers to combat racial profiling.  (SAC ¶¶45-49, 54). The SAC establishes that MTA was on notice of passenger dissatisfaction with MTA security measures due to egregious racial profiling, prior to the Plaintiffs' injury.  Furthermore, the SAC demonstrates that MTA failed to exercise adequate supervision over LBPD officers, despite having the power to control and supervise LBPD officers policing its rail lines (SAC ¶¶19, 48, 50-52, 63-64, 97). These allegations support an inference of deliberate indifference of the need for training and supervision to combat racial profiling and selective enforcement.  (SAC ¶¶77, 78, 79f, 96-97)

Furthermore, the nexus between the inadequate training/supervision and plaintiff's injury is sufficiently plead.[3]  The allegations support the inference that MTA's deliberate indifference to the need for training and supervision to combat LBPD's blatant tendency toward discriminatory policing was the moving force behind plaintiffs' injuries. (SAC ¶¶77, 78, 79f, 96-97)  Therefore, the SAC meets all of the benchmarks for pleading *Monell* on a failure to train/supervise theory.  *See Doe v. City of San Diego*, 198 F.Supp.3d 1153 (2016)

---

[3] In *City of Canton v. Harris*, 489 U.S. 378, 391 (1989), the Supreme Court stated the proper inquiry to be, "Would the injury have been avoided had the employee been trained [and supervised and disciplined] under a program that was not deficient in the identified respects?"

(Ordinance empowered and directed police department to conduct administrative inspections of adult entertainment establishments, there was obvious need to train officers how to conduct administrative inspections, and it could reasonably be inferred that failure to provide adequate training was likely to lead to Fourth Amendment violations, and could amount to deliberate indifference.) *See also Connick v. Thompson*, 563 U.S. 51 (2011) (When city policymakers are on actual or constructive notice that particular omission in their training program causes city employees to violate citizens' constitutional rights, city may be deemed "deliberately indifferent" and thus liable under § 1983 for resulting constitutional violations, if policymakers choose to retain that program.)

In response to these robust allegations plausibly establishing entity liability under the theory of deliberate indifference to the need to train and supervise and failure to supervise, Defendant attempts to prematurely litigate the facts alleged in the SAC.  First, Defendant makes the specious claim that allegations in the SAC contradict the allegations in the FAC. (Mot. to Dismiss at pp. 9-10). This argument is baseless, as the allegations in the SAC do not contradict or undermine the allegations in the FAC.  In fact, the SAC expands the allegations of control identified in FAC by elaborating on the mechanisms MTA uses to exercise control over LBPD officers.  Moreover, Defendant's argument is legally untenable, as precedent dictates that courts should not draw negative inferences or dismiss cases based on slight variations in serial complaints.[4] *PAE Gov't Servs. v. MPRI, Inc.*, 514 F.3d 856, 859 (9th Cir. 2007).

---

[4] Rule 12 provides no authority to dismiss "sham" pleadings.  In *PAE Gov't Servs. v. MPRI, Inc.*, 514 F.3d 856, 859 (9th Cir. 2007), while dismissing defendants' argument that negative inferences should be drawn based on variations between the amended complaints, the court observed as follows:

> At the time a complaint is filed, the parties are often uncertain about the facts and the law; and yet, prompt filing is encouraged and often required by a statute of limitations, laches, the need to preserve evidence and other such concerns. In recognition of these uncertainties, we do not require complaints to be verified, see Fed. R. Civ. P. 11(a), and we allow pleadings in the alternative--even if the alternatives are mutually exclusive. As the litigation progresses, and each party learns more about its case and that of its opponents, some allegations fall by the wayside as legally or factually unsupported. This rarely means that those allegations were brought in bad faith or that the pleading that contained them was a sham. Parties usually abandon claims because, over the passage of time and through diligent work, they have learned more about the available evidence and viable legal theories, and wish to shape their allegations to conform to these newly discovered realities. We do not call this process sham pleading; we call it litigation.

*Id*. at 859 (emphasis added)

1    Second, defendant distorts the facts, alleging that SAC paragraphs 5-7 concede that

2    MTA did not control LBPD officers policing its rail lines.  (Mot. to Dismiss at p. 12). No such

3    concession is made in the complaint. To the contrary, the allegations clearly state that MTA

4    controlled the LBPD officers' conduct in policing MTA's rail lines.

5    Third, defendant inappropriately attempts to litigate the facts at the pleading stage.

6    Specifically, defendant makes the factual argument that, "LACMTA is not a law enforcement

7    agency, does not employ police officers, and therefore cannot reasonably be expected to train

8    or supervise peace officers."  (Mot. To Dismiss at p. 13).

9    Defendant's tactic is misguided, as it is well established that at the pleading stage

10   Plaintiffs' factual allegations are to be accepted at face value and not litigated on the merits.

11   In determining whether the complaint states a claim on which relief may be granted, its

12   allegations of fact must be taken as true and construed in the light most favorable to plaintiffs.

13   *Bell Atl. Corp. v. Twombly, 550 U.S.*  544, 555 (2007) ("assume that all the allegations in the

14   complaint are true (even if doubtful in fact).") *Love v. United States*, 915 F.2d 1242, 1245 (9th

15   Cir. 1990); *see also Lazy* Y *Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

16   Therefore, defendant's factual arguments and baseless intimation of sham pleading should be

17   summarily rejected.

18   **III.    PLAINTIFFS HAVE ADEQUATELY PLEADED THEIR CAUSE OF ACTION**

19   **UNDER THE UNRUH ACT**

20   Plaintiffs have adequately met the pleading requirements to establish a well-pled claim

21   setting forth MTA's unequivocal liability for violations of the California Civil Code Section

22   52 and 52.1 ("Unruh Civil Rights Act").

23   California courts have clearly and repeatedly held that the Unruh Civil Rights Act is to

24   be interpreted "in the broadest sense reasonably possible," so as to achieve its purpose of

25   combating discrimination in all its forms.  *Isbister vs. Boys Club of Santa Cruz, Inc.*, 40 Cal.

26   3d 72, 76 (1985); *see also Arnold v. United Artists Theatre Circuit, Inc.*, 866 F. Supp. 433,

28   438 (N.D. Cal. 1994).  The Unruh Act requires "full and equal accommodations, advantages,

facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51.  Defendant MTA incorrectly states that Plaintiffs have not alleged intentional discrimination.  In fact, Plaintiffs have sufficiently pled intentional discrimination under the Unruh Civil Rights Act in their Second Amended Complaint.  Plaintiffs have alleged that given the statistics, public knowledge, and notice of racial profiling to the MTA, it has intentionally participated in and aided the City of Long Beach in the disparate enforcement of MTA policies that result in the targeting of African-American riders, denying these riders the right to be free of law enforcement harassment, unlawful detention, and selectively enforced Metro Code of Conduct citations. (SAC ¶¶48-52).

The evidence of a disparate impact alleged is relevant to a showing of intentional discrimination. A plaintiff can prove intentional discrimination under the Equal Protection Clause by: (i) showing how a law that is neutral on its face is discriminatory in its enforcement, *Yick Wo v. Hopkins,* 118 U.S. 356, 373-74 (1886) or (ii) proving that a facially neutral law has an adverse impact on the suspect class and is motivated by a discriminatory purpose. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

Notably, in *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142 (1991), cited by defendants, the California Supreme Court acknowledged that evidence of disparate impact was still relevant and admissible, even while holding that plaintiffs bringing Unruh Act claims must prove intentional discrimination, and cannot rely merely on disparate impact. (Mot. To Dismiss p. 15) Specifically the Harris the court observed as follows:

> In so holding, we do not preclude the admission of relevant evidence of disparate impact in Unruh Act cases on proper foundation and subject to the general rules of evidence. <u>Because such evidence may be probative of intentional discrimination in some cases</u>, a blanket rule of exclusion cannot be justified.

*Harris*, 52 Cal. 3d at 1175. (emphasis added)

Defendant MTA appears to unreasonably believe that because Plaintiffs allege disparate impact, they are relying exclusively on this evidence. Defendant's Mot, Dkt. 62, at

p. 15. This is incorrect. Plaintiffs have alleged both direct and circumstantial evidence intentional discrimination, including but not limited to disparate impact through statistics and disparate treatment through anecdotal evidence and evidence of a history of complaints by riders of color and community groups representing riders of color.

Plaintiffs evidence of lack of access and disparate treatment is similar to that pled in *Sturm v. Davlyn Invs. Inc.*, 2013 U.S. Dist. LEXIS 188027, *37-41 (C.D. Cal 2013), where the pleadings were accepted by the court because they showed African Americans, and not children of other races or ethnicities, were singled out at a pool, removed from common areas, prevented from using certain parts of the building, routinely asked to leave the gym, and routinely asked to go inside.)  In *Sturm*, the court found these facts sufficient to comprise intentional discrimination under the Unruh Civil Rights Act.  *Id*. At *40-41. Because the facts alleged in the instant case are analogous to the *Sturm* case, at a minimum, Plaintiffs should afforded an opportunity to conduct discovery and an opportunity to prove their claims.

In *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013), the Ninth Circuit reversed a grant of summary judgment as to an Equal Protection claim, noting that, under *Arlington Heights*:

> "[A] court analyzes whether the defendant's actions were motivated by a discriminatory purpose by examining (1) statistics demonstrating a clear pattern unexplainable on grounds other than discriminatory ones; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged decision; (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant legislative or administrative history. . . . These factors are non-exhaustive."

[internal cites and punctuation removed].

Other cases in the Ninth Circuit or its district courts support denying this motion to dismiss and allow the case to go through to discovery. For example, in *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 903 (D. Ariz. 2013) *vacated in part and remanded on other grounds*, the

1    court found after a trial that the sheriff's office intentionally discriminated against Latino

2    persons, finding, among other things, that defendants did no monitoring to determine whether

3    individual officers demonstrated racial bias, and that a cursory review of arrest statistics

4    would have demonstrated high disparities of Hispanic surnames among those arrested during

5    saturation patrols. *See also U.S. v. Mumphrey*, 193 F. Supp. 3d 1040, 1059 (N.D. Cal. 2016)

6    (criminal defendants allowed to proceed with discovery on their selective enforcement claim

7    where noting that "statistics show[ed] that a significant majority of persons targeted by law

8    enforcement [were] made up members of a protected class."

9            The statistics cited by Plaintiffs are supported by evidence of the wrongs and injustices

10   committed and encouraged by MTA and suffered by African-American riders such as Ms.

11   Williams and Mr. Hill.  At the pleading stage, Plaintiffs have met their burden of satisfying

12   intentional and willful affirmative misconduct and resultant disparate impact on the part of the

13   MTA in its violation of the Unruh Civil Rights Act.

14   **C.    PLAINTIFFS HAVE SUFFICIENTLY PLED A CAUSE OF ACTION**

15           **UNDER THE RALPH ACT**

16           The Ralph Act (California Civil Code Section 51.7) provides that all persons in the

17   state "have the right to be free from any violence, or intimidation by threat of violence,

18   committed against their persons or property . . . on account of any characteristic listed or

19   defined [including race]."  As the court noted in *Jones v. County of Contra Costa*, 2016 U.S.

20   Dist. LEXIS 52471, *13-14 (N.D. Cal. April 19, 2016), such a claim should not regularly be

21   dismissed on a motion to dismiss before the opportunity for discovery regarding the question

22   of discriminatory motive.

23           In their motion, MTA fails to recognize that the Act imposes liability if a defendant

24   "aids, incites, or conspires" in the denial of a right protected under Civil Code Section 51.7

25   (Civil Code section 52(b)). Liability may be imposed on one who aids and abets if the person

26   (1) knows the other's conduct constitutes a breach of duty and gives substantial assistance or

28   encouragement to the other to so act or (2) gives substantial assistance to the other in

---

**PLAINTIFFS' OPPOSITION TO LA MTA'S MOTION TO DISMISS**
**THIRD AMENDED COMPLAINT**

19

1   accomplishing a tortious result and the person's own conduct separately considered

2   constitutes a breach of duty to the third person.  *Austin B. v. Escondido Union School Dist.*,

3   149 Cal. App. 4th 860, 879 (2007).  In this case, MTA had ample knowledge of LBPD's long-

4   standing and well-known pattern and practice of unconstitutional policing.  MTA also

5   provided LBPD with the forum, tools, equipment, and finances to do so.  As in *Austin*, this

6   information is sufficient to pass the pleading stage.

7          While Plaintiffs are not relying on *respondeat superior* for purposes of their *Monell*

8   claim, such principles do apply to a claim under both the Ralph and Unruh Acts. *See, e.g.,*

9   *Winarto v. Toshiba America Elecs Components*, 274 F.3d 1276, 1290, fn 16 (9th Cir. 2001)

10  (Defendant can be found liable for aiding, abetting, or conspiring in the denial of plaintiff's

11  rights under Section 51.7: "It follows that [defendant] can be liable for the acts of its agent.");

12  *Beliveau v. Caras*, 873 F. Supp. 1393, 1400-01 (C.D. Cal. 1995) ("plaintiff here has plainly

13  alleged facts from which the Court may infer that defendant . . . was acting within the scope

14  of his employment when he purportedly committed the acts of sexual battery," declining to

15  dismiss Ralph Civil Rights claim); *Chew v. Hybl,* 1997 U.S. Dist. LEXIS 24547, *12-14

16  (N.D. Cal. 1997) (California Supreme Court's leading cases on *respondeat superior* indicate

17  that it applies to the Unruh Act).

18         As alleged in Plaintiffs' complaint, MTA contracted with the City of Long Beach to

19  provide services to enforce MTA's Code of Conduct.  (SAC ¶¶12, 101).  In so doing, MTA

20  intentionally and consciously selected and engaged LBPD, despite its knowledge that LBPD

21  engaged in discriminatory policing.  (SAC ¶¶52, 54, 79).  When MTA contracted with the

22  City of Long Beach, MTA "paid its wages" by ensuring that financial resources were

23  distributed to LBPD through MTA's enlargement of its policing budget.  In addition, by

24  virtue of its contract and knowledge of LBPD's well-known pattern and practice of

25  discriminatory policing, MTA has the power to discharge the legal relationship at any time.

26  Furthermore, MTA directs and controls LBPD's conduct through its direction as to the over-

28  deployment of officers in low-income communities of color and by providing them policies,

equipment, tools, and a forum to enforce MTA's Code of Conduct.  Finally, MTA contracts LBPD to engage in the "regular business" of enforcing the Metro Code of Conduct.

Plaintiffs have pleaded sufficient facts to allege that MTA acted in concert or conspired with LBPD to eject, or aid, or incite or conspire in ejecting Ms. Williams and Mr. Hill from the MTA Blue Line station for fare evasion on the basis that they were African Americans.

This court should deny this motion to dismiss for violations of the Unruh and Ralph Civil Rights Act, as they are factual issues that should be left for a jury to decide.

## CONCLUSION

For all the reasons stated herein, this Court should deny Defendant LA County MTA's Motion to Dismiss. If this Court should find Plaintiffs' allegations insufficient in any way, Plaintiffs request leave to amend.


DATED:  April 12, 2019                         Respectfully Submitted,



                                               By:
                                                     /s/ Lisa Holder_____
                                                     Lisa Holder, Esq.
                                                     Shirin Buckman, Esq.
                                                     Alana Yakovlev, Esq.
                                                     Attorneys for Plaintiffs
                                                     KATHLEEN WILLIAMS
                                                     MICHAEL HILL